**GULF PRODUCTION CO. v. TRANS–BAY OIL CO. (No. 8993.)\***

Court of Civil Appeals of Texas. Galveston.
May 18, 1927.

Rehearing Denied June 9, 1927.

1. Sales 53(1)—Evidence held insufficient to make issue as to defendant's agreement to purchase oil tanks which it used under statement that it would buy or lease.

In action to recover purchase price of oil tanks which defendant used with plaintiff's consent under statement that it would either buy or lease them, evidence *held* insufficient to make issue for jury as to existence of agreement to purchase, notwithstanding plaintiff had declined to lease tanks.

2. Trover and conversion 66—Evidence held insufficient to make issue of conversion of oil tanks used without protest from plaintiff.

Evidence *held* insufficient to make issue for jury as to conversion of oil tanks of which defendant took possession in presence of plaintiff's representative, without protest from him, under belief that further negotiations would be carried on looking to their lease or purchase, and from which defendant removed oil placed therein when attempts to come to agreement were unsuccessful.

3. Trover and conversion 47—Plaintiff held entitled to reasonable value of defendant's use of plaintiff's oil tanks pending unsuccessful negotiations for sale or lease.

In action to recover purchase price of oil tanks or, in the alternative, for conversion, plaintiff, though not entitled to recover their price or value, could recover reasonable value of defendant's use of tanks and resulting damage, if any, where defendant had used them for period of one month for storage of oil pending unsuccessful negotiations for sale or lease.

Appeal from District Court, Galveston County; J. C. Canty, Judge.

Suit by the Trans-Bay Oil Company against the Gulf Production Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Roy Johnson, of Galveston, and Claude Mc-Caleb, John Broughton, and John E. Green, Jr., all of Houston, for appellant.

Stewart, Damiani & Harris and Brantly Harris, all of Galveston, for appellee.

LANE, J. This suit was brought by the Trans-Bay Oil Company against the Gulf Production Company, hereinafter referred to as the Production Company, to recover the sum of $5,740.80, with interest thereon from May 10, 1925, alleging that said sum was due it as the agreed price of two steel tanks which the Production Company purchased from it on or about the 10th day of May, 1925.

In addition to alleging an express agreement to purchase the two tanks, the plaintiff set up a cause of action in the alternative, alleging that defendant, without plaintiff's consent or permission, had converted the tanks belonging to the plaintiff to its own use, and that the reasonable market value of the tanks so converted by the defendant amounted to the sum of $5,740.80.

The defendant answered by general and special exceptions, general denial, and special denial that it ever purchased, or agreed to purchase, the two tanks, and also denied that it ever asserted title or intended to assert title, or that it ever asserted any acts of ownership, or denied that plaintiff was the owner of the two tanks; that defendant did use the two tanks for about 30 days, for the purpose of storing certain oils, with the consent of the plaintiff, upon the agreement and understanding that the defendant was to pay the plaintiff the usual rental value for the use of the tanks; and that said tanks were permanent fixtures located on certain land held under lease by plaintiff, and that defendant, when it used the tanks for the purpose of storing oil, did not in any manner interfere with plaintiff's right to the possession of such property, or deny plaintiff's ownership, and

further averred that it was ready and willing to pay the plaintiff the usual rental value for the use of said property.

The court overruled all demurrers and exceptions and submitted the case to a jury upon the following special issues and instructions, to wit:

Special Issue No. 1: "Did the defendant agree to purchase the tanks?"

Special Issue No. 2: "Did defendant use the tanks under any agreement of rental?"

Special Issue No. 3: "Did defendant take possession of and use the tanks after being informed by Carter that plaintiff would not lease same, but that he would only sell same?"

"In determining your answer to special issue No. 1, as to whether or not defendant agreed to purchase said tanks, you are instructed that to constitute a purchase there would have to be a contract of sale—that is, an agreement between the two parties, plaintiff and defendant, the plaintiff to sell and the defendant to buy the tanks at an agreed price. This agreement may be implied by the action of the parties, as well as by definite words of the parties."

"You are hereby instructed that the burden of proof is upon the plaintiff to prove the affirmative of special issues Nos. 1 to 3 by a preponderance of the evidence; and, if it fails to do so, you will answer said issues in the negative, that is, 'No.'"

To the special issues the jury answered: To No. 1, "Yes;" to No. 2, "No;" and to No. 3, "Yes."

Upon the answers of the jury and the evidence, the court rendered judgment for the plaintiff for the sum of $5,972.88. From the judgment so rendered the Production Company has appealed.

Appellant's contention is that the court erred in overruling its motion for an instructed verdict in its behalf, in that there was no evidence to show that appellant had agreed to purchase the tanks, or to show that appellant converted the tanks, or that it took possession thereof without the consent of appellee. We think the contention that there was no evidence showing that appellant had agreed to purchase the tanks or that it converted them should be sustained.

That appellee did not desire to lease or rent its tanks, and that it held them, contemplating that some oil company, which had no storage facilities and which might bring in a producing well near them, would purchase them so as to save it from loss on the same, may be conceded. It may be also conceded that appellant, the Production Company, upon the bringing in of its producing well, without storage facilities, was very anxious to procure the tanks in which to store its oil, a great portion of which might have been lost without them, but such concessions do not tend to show or prove that it made either an express or implied agreement with Carter, the president of appellee, the Trans-Bay Oil Company, to purchase the tanks. Whether there was or was not such an agreement is to be determined, not from the desire of appellee to sell, nor the circumstances making it necessary for appellant to procure storage for its oil, but upon the question as to whether appellant expressly or impliedly unconditionally agreed to purchase the tanks upon the specific terms made by Carter.

The evidence with reference to such agreement is substantially this: Carter, who alone represented appellee in the negotiations in question, testified substantially that three or four days before appellant's oil well was brought in, he called the Production Company over the telephone and asked to speak to the manager of the production department; that Mr. Buchanan answered as such manager; that in the conversation over the phone he told Buchanan that he had the two tanks near the well of his company; that he had kept them for an emergency, hoping that he would be able to sell to some one whom might need them in a hurry; that he would not lease or loan them, but would sell them; and that if he (Buchanan) needed them he would be glad to sell them to his company at what the Parkersburg Rig & Reel Company charged him for the same; that he paid said company for the two tanks $5,740.80; that on the occasion mentioned, Mr. Buchanan told him that he would look into the matter and let him hear from him later; that the next day Buchanan called him over the phone and asked who owned the land on which the tanks stood, and asked about the lease on the same; that he told Buchanan that the land was owned by the Great Western Oil Company, and that Mr. Tiernan, of Houston, was the agent of said company; that in a few days after the above-mentioned conversation, to wit, on the 10th day of May, 1925, he went to the oil field to see if appellant's well had been brought in so that he might be there and see if appellant would need his tanks; that while he was at said oil field the well came in as an oil producer; that he at once saw a Mr. Rosser, the driller of the well, and repeated to him the conversation he and Buchanan had had a few days theretofore, and told Rosser that the tanks were available to appellant if it wanted to buy them; that Rosser, the driller, called Mr. Clements, of Houston, over the telephone and asked Clements in his presence what appellant wanted to do with the well, that is, what he should do with the oil; that he told Clements that Carter was with him and had some tanks near the well which he wanted to sell; that Clements told Rosser to put him, Carter, on the phone; that he took the phone and told Clements of the conversation he had had with Buchanan two days theretofore and told him that the tanks were for sale and that he did not care to loan or lease them; that if the Production Company wanted to buy them they were available and pipe lines could be connected; that then Clements told him to put Rosser, the driller, back on the phone; that after

Clements finished talking to Rosser, Rosser told him (Carter) that Clements told him to go ahead and connect up to the tanks and run the oil in, and he said that he would either buy them or lease them, and thereupon Carter told the driller the tanks were not for lease, that he had already explained that they were not for lease, but only for sale, and that he was not willing for Rosser to use the tanks unless his company should buy them; that Rosser told him that he had no authority to buy the tanks; that notwithstanding his statement that the tanks were for sale only, Rosser at that time pumped oil in the tanks and kept it in there for about a month; that Rosser stated that he had no authority to buy the tanks, but that Mr. Clements told him that he (Clements) would lease or buy them, and that he, Carter, said they are not for lease or loan; that in his conversation with Clements and Buchanan he told them he would sell the tanks at the invoice price—that is, the price at which they were sold to his company. When asked if he did not give Rosser permission to turn the oil into the tanks, he said:

"Well; I didn't keep him from turning the oil in. I don't hardly know just how I can answer that question; I told him they were there, and if he (Rosser) wanted to buy them he could run oil in them, and if they didn't, they couldn't."

Testifying further he said:

"No; I didn't give Rosser permission to turn the oil in those tanks. As to whether I delivered the tanks to Rosser: They were where they were. With reference to whether he had any right, when he finished his talk with me, whether I gave him any right to go in there, whether I regarded them as his tanks when that conversation was over, well, not with the statement he made to me. I knew he was running oil in there; yes, sir. Do I have to answer yes or not, whether I told him not to do it? No; I didn't tell him not to. I told him he could do it if he wanted to buy the tanks, but not otherwise. He didn't tell me he would buy them; he told me he would buy them or lease them; that is what he told me. After this telephone conversation Mr. Rosser told me in words similar to this: 'I have no authority to buy these tanks, but I have authority to lease them.' After the oil was turned into these tanks, I went to the Gulf Production Companys' office in Houston and had a talk with Mr. Buchanan. Yes, sir; I talked to him about buying the tanks. That was after the oil was already in, yes, sir, and out. Yes, sir; I believe I did talk to him about buying the tanks, and if he didn't buy the tanks I wanted him to pay me 20 cents a barrel storage on it. Yes, sir; after I talked with Mr. Buchanan, I also talked to Mr. Nazro, the vice president. I asked Mr. Nazro to pay for the tanks. With reference to whether I didn't ask him to buy them: Well; that is the same thing. As to whether I used the word 'buy' or 'pay': Well; I went there to collect the money. With reference to whether I asked Mr. Nazro to buy the tanks: I don't just know in what specific words I put it. As

to whether they didn't ask me to try to get the land the tanks were on, that they wouldn't buy the tanks on somebody else's land if they couldn't: I don't think they asked me about the land at that time. I think probably it was one or two days before I had the discussion that they asked me about buying the land; it was between the time the well came in and the first time I telephoned them about the tanks. I believe they asked me about the title to the land one or two days before. I think it was Mr. Buchanan who asked me about it. After the oil was turned in the tanks, I called up Mr. Tucker, of the Gulf Production Company. Well; in a way, I asked him if he was going to buy the tanks. I asked him what he was going to do about paying for them. I don't think I asked him the direct question, if he was going to buy the tank; I don't think just in those words; no, I don't think he asked me how much I wanted for them; I couldn't state specifically; I don't just remember the incident. * * * No, sir; I never did request the Gulf Production Company to return the tanks to me. With reference to whether they did disconnect them when we got into the dispute about—whatever the dispute was—they did disconnect the tanks. They disconnected the tanks after they ran the oil out and emptied them. No, sir; I did not still regard them as my tanks when the oil went in there.

"As to how this 5,000 barrel tank was built: Well, right on the ground; nothing underneath; the ground is thrown up maybe a foot, and maybe not quite so high. It is bolted in sections. If you take it down, you do not necessarily have to take it to pieces. Well; you could take some long beams and slide it away. Yes; it would be just about as hard to move as a house. I went up to Houston to see Mr. Buchanan after the oil was placed in the tanks; I went up to collect for the tanks. No, sir; I didn't go up to talk about the future sales. When I went up there, I talked to him about getting the money; yes. He said all they would give me was $100. Yes, sir; I objected to that. As to what my purpose was in making the remark about 20 cents a barrel, as to what led up to the 20 cents a barrel: Well; when they offered to pay me $100 for the use of the tanks and wouldn't pay me for the tanks, I offered to accept either $1,400 or $1,500 as a compromise. That was a compromise of my claim for the sale of the tanks; yes. No, sir; they wouldn't pay it to me; they wouldn't pay me that; no, sir. No, sir; they did not call me up to come over there when the well came in. As to whether I called Buchanan or Buchanan called me: I called Buchanan. No; they didn't make any effort to buy the tanks, and I didn't make any efforts to loan them. With reference to this $1,400 that I offered to accept, whether that was based on rental or sale: Well; it figures out 20 cents a barrel approximately. I don't think I quoted it at 20 cents a barrel in discussing that. No, sir; I didn't ask Mr. Nazro to buy the tanks. I think Mr. Nazro told me that he couldn't buy the tanks because he couldn't get a lease on the land on which they were located, or couldn't buy the land.

"In my talk with Mr. Clements, of the Gulf Production Company, Sunday morning at the store at High Island over long distance, the price I stated I would take for the tanks was

the invoice price. Those two exhibits that were introduced, from the Parkersburg Rig & Reel Company, they represent the invoice price; yes, sir. No; I never did discuss any rental price with any one in regard to those tanks. It was about two or three weeks after the well came in, I don't remember the exact date, when I went to Houston. When I went to Houston and talked to Mr. Nazro and Mr. Buchanan at that time, I did not make any proposition to lease the tanks. At that time, after the well was brought in, when I went to Houston, I made an offer of sale—well, no; I didn't make any offer of sale. No, sir; I didn't make any offer of sale at that time. Well; I wanted to collect for the tanks when I went up there, and they refused to pay me for them, and I refused to take $1,400 or $1,500 as a compromise of my case. Yes; I was to get something else in my offer of compromise; I was to get the tanks back. That was my offer; yes, sir."

There was much evidence offered by appellant the purpose of which was to show that there was neither a purchase nor conversion of appellee's tanks by appellant; but since we are now discussing the question of whether or not there was any evidence which would support a finding that there was such purchase or conversion, we have undertaken to state only the evidence which appellee contended supported such finding. ·

[1] Taking the testimony of Carter alone, he being the only witness presented to prove a sale, it fails to show that any one with authority had either expressly or impliedly agreed to buy the tanks for appellant; to the contrary, he testified that Rosser told him that he had no authority to buy them and that Clements had told him that he would either buy or lease. This last expression of Clements, delivered by Rosser to Carter, could but have conveyed to Carter that Clements, before concluding as to which he would do, buy or lease, would have further negotiations with Carter. Carter could not have understood that the expressions of Clements meant that he was closing a negotiation of purchase, and he knew that Rosser could not do so. Such being the case, appellee was not entitled to a recovery for the invoice price of the tanks, as was awarded to him upon a finding that appellant had purchased them.

[2] We are also of opinion that the evidence clearly shows that the agent or agents of appellant took possession of the tanks in the presence of appellee, put oil therein in his presence, and without his protest, under the belief that further negotiations would be carried on looking to their lease or purchase, and that as soon as they ascertained they could not come to an agreement with Carter, the oil was removed from the tanks, thus showing that appellant did not intend to, nor did it in fact, convert the tanks as that term is generally understood.

[3] Though we have reached the conclusion that there was no evidence to support a finding that appellant either purchased or converted appellee's tanks, we cannot reverse the judgment and render judgment for appellant, as the undisputed evidence shows that appellant's agent ran its oil into appellee's tanks and kept the same stored therein for about a month. It being so shown, appellee would clearly be entitled to a recovery for the reasonable value of the use of its tanks, together with such damage, if any, as resulted to it from their taking and use by appellant.

Having reached the conclusions as above expressed, the judgment is reversed and the cause is remanded.

Reversed and remanded.

GRAVES, J. (concurring). I agree to the reversal ordered, but not upon the grounds stated in Judge LANE'S opinion, that is, "that there was no evidence showing that appellant had agreed to purchase the tanks, or that it had converted them," and that "the evidence clearly shows that the agent or agents of appellant took possession of the tanks in the presence of appellee, put oil therein in his presence, and, without his protest, under the belief that further negotiations would be carried on looking to their lease or purchase, and that as soon as they ascertained they could not come to an agreement with Carter, the oil was removed from the tanks."

While the direct testimony as to the authority of Mr. Clements to make it was scanty, considering all the circumstances tending toward that inference, there being, too, no request from appellant that that question be submitted to the jury, I think there· was enough to justify the jury's finding that an agreement to purchase was effected, and, further, that the answer to special issue No. 3 cannot be said to be without support.

Obviously there was no such complete contract expressed between the parties as would itself constitute a sale, but, as the court correctly told the jury in explanation of special issue No. 1, the agreement might be implied from their acts as well as determined from their words; throughout his testimony, Carter never receded from his consistent declaration that he always stipulated successively with each and all of appellant's several representatives that he *would not* lease but *would* only sell his tanks, and that they could not use them upon any other condition; this being true, and his statement further being that in the face of this invariable and known restriction, appellant took possession of and used the tanks through Mr. Clements' order, there was an acceptance of his offer to *only sell* through an act. 13 C. J. 275; Mott v. Jackson, 172 Ala. 448, 55 So. 528; Lester v. Hutson (Tex. Civ. App.) 167 S. W. 322; Petroleum Products Dis. Co. v. Alton Tank Line (1914) 165 Iowa, 398, 146 N. W. 52; Shaenfield v. Hall Safe & Fixture Co. (Tex. Civ.

App. 1913) 157 S. W. 462; Chelf v. Smith (by the Virginia Special Court of Appeals) 131 S. E. 846, 44 A. L. R. 1175.

It seems to me that, in these undisputed circumstances, Mr. Clements ordered the use of the tanks *any way* at his peril, and, that as he confessedly did not subsequently obtain any modification or reduction of Mr. Carter's offer into one for a mere lease, his principal was bound by what he had thus done.

But there was testimony from another source to the effect that Mr. Carter did not so invariably stick to the imposition of the condition that he would not lease but would only sell; upon this issue the witness Rosser testified that when he told Mr. Carter what Mr. Clements said, that he did not have any authority to buy the tanks and that he (Rosser) could not talk about buying the tanks, that Mr. Carter said:

"Well; I would rather sell the tanks, but go ahead, the Gulf Production Company will treat me right, either rent or buy them."

The matter having been properly raised by the pleadings also, the appellant requested the submission of this question to the jury in its requested charge No. 4, which the trial court refused, as follows:

"Did or did not the defendant take possession of and use the tanks with the understanding on the part of Rosser, the driller for the defendant, that the defendant would use the tanks, and that the question of purchase, lease, or rental would be taken up later by the plaintiff with the defendant? Answer yes or no."

This action, in my opinion, constituted reversible error. G. H. & S. A. Ry. Co. v. Washington, 94 Tex. 510, 63 S. W. 534; Colorado & Santa Fé Ry. Co. v. Rowe (Tex. Com. App.) 238 S. W. 908; Suttle v. Texas Electric R. R. Co. (Tex. Civ. App.) 272 S. W. 256.

While the evidence for appellee was sufficient to support the pertinent finding in its favor, there was no justification for not submitting the opposing contention when thus properly presented by both pleading and testimony.

Neither can I accept this court's finding, in effect, that appellee was clearly shown to have acquiesced in appellant's taking possession of his tanks under the belief that further negotiations would be carried on looking to *their lease or purchase*; that was the very issue so refused submission by the trial court at appellant's request, and, to say the least about the state of the evidence upon it, was a disputed question of fact. Upon the one hand, Carter testified that he stood always upon his condition that if they used his tanks at all it must be as upon a sale, whereas appellant's witness Rosser swore that he waived that requirement. Under his own version of what he did, Carter had the right to assume that if they took possession of his tanks, it

would be upon the expectation of buying them, hence it was unnecessary for him to protest or prevent them from doing that.

I agree, under the undisputed facts, that there was no permanent conversion, hence appellee was in no event entitled to the full value on that theory; but if what was actually done did not amount in law to a sale, then, in the plain absence of a lease, there seems to me to have been a conversion for the length of time appellant used the property, under such authorities as Baldwin v. Davidson (Tex. Civ. App.) 127 S. W. 562, and France v. Gibson (Tex. Civ. App.) 101 S. W. 536. Indeed, although not therein so denominated, that appears to be basis for this court's order of a remand. I think the order should have been grounded upon the refusal of the requested charge referred to.